ROBERT HUNTER CRAIG et al. Respondents, v. CHARLES H. SEYBT, Appellant.

**St. Louis Court of Appeals, December 19, 1901.**

1. **Contract, Construction of, in Case at Bar:** EVIDENCE: GUARANTEE. Evidence, in case at bar, examined and it is held that defendant's guarantee on overdrafts was understood by both parties that the defendant would make good to plaintiffs all difference between the net proceeds on the sales of the shipments on the European market and the drafts drawn on the shipments of flour by the shippers with defendant's approval, and which had been honored by the plaintiffs.

2. ———: ———: CONSTRUCTION PLACED ON CONTRACT BY PARTIES HAS GREAT WEIGHT AS TO MEANING OF VAGUE CONTRACT. When the language of a contract is vague, or if it is susceptible of different constructions, then the construction which the parties have placed upon it and acted on, is of great weight.

3. ———: ———. And in the case at bar, the appellate court views the contract as construed by the parties and finds that the arrangement to limit drafts to two-thirds or three-fourths of the value of the flour at the place of shipment was for the protection of defendant, and that it was not intended by the parties to restrict or limit defendant's guarantee against overdrafts.

Appeal from St. Louis City Circuit Court.—*Hon. John A. Tally*, Judge.

AFFIRMED.

*Charles W. Thomas* for appellant.

(1) After the interest of the parties has been determined from the instrument itself, or from the instrument and the surrounding circumstances, the rule of strict construction

applies, and a guarantor can not be held beyond the precise terms of his contract. Blair v. Ins. Co., 10 Mo. 559; Shine v. Bank, 70 Mo. 524. (2) Nothing can be clearer, upon both principle and authority, than the doctrine that the liability of a guarantor is not to be extended by implication beyond the terms of his contract. Miller v. Stewart, 9 Wheat. 680; Belloni v. Freeborn, 63 N. Y. 388. (3) The mere opinion of one of the parties to a contract, expressed after the contract is made, as to how it ought to be construed; or loose or indefinite expressions upon that subject, unaccompanied by any acts, or series of acts, which would serve to interpret the contract, have no controlling force as to its real meaning. St. Louis Gas Co. v. City of St. Louis, 46 Mo. 121; Davis v. Sexton, 35 Ill. App. 407; McDermott v. Life Assn., 24 Mo. App. 73. (4) When a contract is free from doubt, no erroneous interpretation by the parties will control its meaning. Smith Drug Co. v. Saunders, 70 Mo. App. 221.

*E. S. Robert* and *C. C. Collins* for respondents.

(1) The defendant was an original promisor and not a guarantor. A promise to pay is an original undertaking, and not a guaranty, when it is founded on a consideration moving from the promisee to the promisor, or when the promise is made not so much to insure the debt of another, as to secure some advantage to the promisor, although the promise in its form may be to pay the debt of another, and although the performance of it may have the effect of extinguishing that liability. Winn v. Hillyer, 43 Mo. App. 139; Crawford v. Edison, 45 Ohio St. 239; Walther v. Merrill, 6 Mo. App. 370. (2) The promise is an original undertaking when the credit is given to the promisor and not to the third party. Rottman v. Fix, 25 Mo. App. 571; Price v. Railroad, 40 Mo. App. 189; Hartley v. Vassar, 88 Ill. 561; Chase v. Day, 17 Johns. (N. Y.) 114. (3) That the original charges

Craig et al. v. Seybt.

on plaintiff's books may not have been entered against the defendant is not conclusive of the fact that plaintiffs extended any credit to the millers. Swift v. Pierce, 13 Allen 312; Hazen v. Bearden, 4 Sneed 48; Champion v. Doty, 31 Wis. 190. (4) Defendant has not been discharged (a) by payment, (b) nor by alteration of the contract, (c) nor by misrepresentation, fraud, concealment, or non-compliance with the terms on which he became bound, (d) nor by the plaintiffs negligently losing security for the debt, (e) nor by the giving of time to the debtor, (f) nor by the acceptance of the note from Burrton Grain and Milling Company, (g) nor by any lack of diligence of the plaintiffs in attempting to collect from the millers. Wiles v. Robinson, 50 Mo. 47; O'Bryan v. Jones, 38 Mo. App. 90; Brandt on Suretyship, sec. 101. (5) While it is customary to construe the words of a contract according to their ordinary meaning, yet where they have acquired a peculiar sense in respect to a particular subject-matter (as by the known usage of trade, etc.), or where the parties used them in some other sense, such peculiar or secondary meaning will be enforced. Lovelace v. Travelers' Protective Ass'n, 126 Mo. 104; Clarkson v. Hatton, 143 Mo. 47; Carter v. Alexander, 71 Mo. 585.

BLAND, P. J.—By consent of all parties this cause was referred to A. N. Crane, Esq., who, after hearing the evidence, made his report to the court. From this report we take the following extracts as indicating the nature of the action and defense, and the facts found and conclusions arrived at by the learned referee.

### "THE CONTROVERSY.

"The plaintiffs are British commission men, engaged at several places in the United Kingdom in the sale of flour, consigned to them for that purpose. The defendant, who resides

in Missouri, is engaged in the milling business, but for many years has been also engaged in the business of exporting flour to foreign markets, principally as a middleman or agent, encouraging such exports by other millers. He does business in the city of St. Louis, Missouri. By the mediation of the defendant, many millers in the West consigned flour to the plaintiffs for sale, and this suit is brought to hold the defendant responsible for the overdrafts of sundry Kansas millers, who shipped flour to the plaintiffs, the claim being for the difference between the net proceeds of the sales and the amount drawn on the plaintiffs when the flour was shipped.

"The petition exhibits losses sustained by the plaintiffs, in the manner mentioned, in respect of the flour shipments by four Kansas milling concerns, during and after 1891, and charges that the defendant, by a contract made with the plaintiffs in June, 1887, agreed to compensate them for losses sustained in that manner.

"The amended answer denies the shipments, denies the contract, pleads the statute of frauds and matter of recoupment. Also that the defendant is discharged of liability as to some of the claims by reason of settlements which the plaintiffs have made with the shippers, and discharged altogether because of the negligence of the plaintiffs in failing to protect themselves by obtaining proper margins from the shippers, and negligence and disregard of instructions in making the sales.

## "THE LOSSES.

"According to the evidence, the losses in question, including commissions with interest items down to March 31, 1893, occurred in the following instances:

"One shipment by Scott & Jeffries of McCracken, Kansas, received at London in April, 1892, and sold June 29, 1892, $121.76, of which $16.90 is interest and $10.62 is commissions. Five shipments by said Scott & Jeffries re-

ceived at Liverpool March to June, 1892, sold August 29 to October 21, 1892, $239.20, of which $87.76 is interest and $87.34 is commissions. Five shipments of the Burrton Grain Company of Burrton, Kansas, received at Liverpool January and February, 1892, sold February 10, April 1, May 13, November and December, 1892, and February, 1893, $911.46, of which $73.96 is interest. Twenty-one shipments of said Burrton Grain Company received at London December, 1891, to August, 1892, sold January 6 to December 20, 1892, $3,098.10, of which $453.36 is interest and $334.90 commissions. One shipment of the Hunter Milling Company, Wellington, Kansas, received at Liverpool February, 1892, sold January and February, 1893, $703.06, of which $89.84 is interest.

"The aggregate claims for actual losses on the consignments of the three parties mentioned, exclusive of interest, is $4,371.76, of which there is $1,622.16 arising from shipments to Liverpool and $2,749.60 in shipments to London.

"THE CONTRACTS AND TRANSACTIONS BETWEEN THE PARTIES.

"The contract between the plaintiffs and the defendant is evidenced by letters. It appears that on May 26, 1887, the plaintiffs wrote to the defendant appointing a meeting for their Mr. Begg with him at Antwerp, Belgium, for the purpose of conferring about flour shipments to Liverpool and Glasgow. This meeting took place and resulted in an arrangement concerning which the plaintiffs on June 25, 1887, wrote to the defendant that they understood said arrangement to be as follows:

"1. 'You influence business to us.' 2. 'You stand between us and the millers in cases of claims for inferiority of quality or otherwise in purchases, and in cases of overdrafts, etc., on consignment.' 3. 'Business will be conducted through you or direct with the miller as you may direct.'

Craig et al. v. Seybt.

4. 'You receive one-half per cent commission on all business done through your connection.' 5. 'Above arrangement is not to interfere with out present connections or with our freedom to work with millers direct. In addition to our Liverpool, Belfast and Glasgow business, we are doing a nice trade with Lieth, and would like you to send on a few lots there.' The reply of the defendant to this letter is dated July 10, 1887. He says that 'the five points covering the arrangement between you and me as enumerated in yours of the 25th are correct.' And among other things he says 'in my next I will give you a detailed information with whom you have to have direct cable connection and whose cable business will go through my hands. Please understand that you must correspond and keep your accounts with all the shippers as though I had nothing to do with it. You, of course, will keep me informed of important points of your correspondence so that I can act intelligently as your confidential adviser and business friend.'

"By a letter dated July 27, 1887, the plaintiffs note the receipt of the defendant's letter of the 10th and say to him 'we will as requested keep you advised weekly of anything of importance with regard to shipments and correspondence with those millers.'

"Under this arrangement business was begun, but, not being large, the plaintiffs, who in the meantime had established a branch house in London, sent over their Mr. Begg the latter part of 1889, to make a personal effort with the millers in the West. With the aid of the defendant a meeting was held on Thanksgiving day of that year at Newton, Kansas, when some twenty odd millers were present with their samples, and were addressed by Mr. Begg and by the defendant touching the advantages of shipping flour to the plaintiffs for sale. This conference extended far into the night and seems to have caused an increased business with the plaintiffs. Among the new customers were the millers whose shipments resulted in the losses here complained of and whose ac-

quaintance Mr. Begg made at the meeting just mentioned. The business, however, was carried on by participation of the defendant under the arrangement set forth in the letters, and practically as follows:

"The defendant kept himself informed of the proposed shipments; the amount and quality of the flour; its market value at the place of shipment; and when ready to go forward he got it insured, made the freight contract and obtained the foreign bill of lading. He also determined the amount which the shipper should draw on the plaintiffs against the consignment; the plaintiffs having consented to honor such drafts not to, exceed two-thirds or three-fourths of the market value of the flour at the place of shipment f. o. b.

"In cases of difference between the plaintiffs and the shippers, and such shippers for whom the defendant had not acted, he was sometimes requested by the plaintiffs to act for them, and did so.

"The plaintiffs, on their part, paid the drafts and other charges and expenses of the shipments, made sales and reported its accounts thereof to the millers. They also reported some of the London sales to the defendant; but, according to the defendant and Geisman, his clerk, no reports of sales made at Liverpool or at Glasgow were received by him; and he received reports of a part only of the sales made at London. If sales resulted in losses to the plaintiffs they usually drew on the millers for the deficiency, and sometimes entrusted the collection of such drafts to the defendant. And in the case here in question, drafts of that character, or, as they have been otherwise styled here, drafts to keep up the margin, were drawn by the plaintiffs on all three concerns. Generally, these drafts were not honored, but the Hunter Milling Company and the Burrton Grain Company each paid one draft, drawn by the plaintiffs from Liverpool, and the Burrton company also consigned to the plaintiffs at London a car of flour against which no draft was drawn by the shipper. These drafts were paid

in February and March, 1892, and the car of flour was received by the plaintiffs in May of the same year.

"I do not think that the defendant was kept fully informed of the details or amounts of sales which resulted in the losses here complained of. He knew of a draft for margins, drawn June 11, 1892, by the plaintiffs on the Burrton company, and a draft drawn for the same purpose on Scott & Jeffries, in August, 1892; for these drafts seem to have been entrusted to him for collection, but were not paid. And the defendant, by letter dated August 23, 1892, complained to the plaintiffs for not calling for margins earlier, instead of relying on his guarantee; and on September 19, 1892, he writes that Scott & Jeffries is a hard case, and that he has put the claim against the Burrton company into the hands of his attorney.

"Several letter-press copies of amounts of sales, addressed to the Burrton company, are produced here by the defendant. They are dated November 23 to December 21, 1892, and cover twelve shipments to London, and are identical with the amounts on pages N, O, P, Q, S, T, U, V, W, X, Y and Z of 'Exhibit A' to the plaintiff's petition in this case.

"At the date of these statements the Burrton company was insolvent, and probably was so when the draft of June 11 was drawn. Mr. Henderson testifies that a statement of sales resulting in losses on shipments, by Scott & Jeffries, to Liverpool, was mailed to the defendant October 1, 1892. This concern was then insolvent, as may be inferred from the defendant's letter of September 19, already referred to.

"It appears that other orders for money were sent by the plaintiffs to the Burrton company, November 23 and 30, and December 24, 1892, none of which were paid. After some correspondence, James Craig, of plaintiffs' firm, came to America. Here he first met the defendant at Chicago, June 8, 1893. At this interview, the defendant expressed himself as being freed of his guaranty, but did not definitely refuse

to settle. Craig testified that he thought that the defendant would settle because he said he would not attempt to shuffle out of a just or moral debt; and because he had written to the plaintiffs, on the fourteenth of December, 1892, that 'when you get through (if ever) with disposing of the goods, then will be time to discuss a settlement of the whole nasty business.'

"Accordingly, Craig came to St. Louis, where he next met the defendant about June 20, 1893. The defendant now said that the delay of the plaintiffs in selling had absolved him from his guarantee, and that he did not owe them a cent. Being definitely asked to settle the loans, he said that he would be damned if he would.

"Craig then proposed arbitration, naming E. O. Stanard as arbitrator. To this the defendant consented, but Stanard would not act. Later on they met at the defendant's office, where another way of arbitrating was proposed by Craig, but was declined by the defendant. Craig then proposed that they should go together and see the millers, which the defendant at first refused, but finally agreed to, provided the millers could be got together at Kansas City. According to Craig's testimony, he then asked the defendant how it would be if the millers would not come? The reply of defendant was, 'you can please yourself, and act in any way you like in order to get this money back.' Then said Craig, 'I have a free hand to do what I please.' To this defendant answered, 'I will be very pleased if you can arrange something to get this disagreeable business squared up with the millers.'

"Craig could not get the millers together, and he visited them severally, alone. He took the note of the Burrton company, payable in one year, for the amount of the plaintiffs' claim against that concern. He compromised the claim against Sawyer, taking notes, which having been paid, that claim is withdrawn from this suit. He saw Hunter, of the Hunter Milling Company, who refused to settle, claiming to have a

counterclaim of several hundred pounds against the plaintiffs. He had some correspondence with Scott & Jeffries, but did nothing with them. Craig returned to St. Louis, and again saw the defendant July 12, 1893. He now asked him to indorse the Burrton and Sawyer notes, which the defendant refused to do.

"The next occurrence of any consequence between the parties was the bringing of this suit December 13, 1893.

### "THE DEFENDANT'S OBLIGATION.

"The nature of the obligation of the defendant is in dispute. His counsel say that it is a guaranty, while the plaintiffs contend that it is an original undertaking. Gathered from the aforementioned letters of June 25 and July 10, 1887, the agreement of the defendant was to stand between the plaintiffs and the millers in cases of claims for inferiority of quality or otherwise in purchases, and in cases of overdrafts, etc., on consignments. These letters constitute the agreement. Other letters and some testimony of the defendant show that he would have been willing to treat the agreement as covering an obligation like the one which the plaintiffs contend for, had the latter complied with his view of the agreement, on their part. But those other letters and testimony fall short of a promise, and do not extend or add to the scope of the agreement contained in the letters first mentioned, and upon the agreement as there expressed the rights and duties of the parties must be determined in this case. And considering that the defendant was not acting as a principal in making these shipments and drawing of the drafts, I do not think that the words 'you stand between us and the millers in cases of overdrafts on consignments' mean that the defendant takes the place of the millers in respect of their original liability, but that the most that can be claimed for those words is, that in the cases mentioned the defendant shall make the losses of the

plaintiffs good if the millers do not.    And this is a contract of guaranty.    And the parties in their correspondence and testimony speak of it as such, though in doing this they may not have understood the legal effect of the term 'guaranty.'    Mr. Begg, who acted for the plaintiffs in making the agreement, testifies that the words 'you stand between us and the millers in cases of claims,' etc., 'were understood by Seybt and himself to mean that he guaranteed us in cases of claims, reclamations,' etc.    And what is more to the purpose is, that in practice the plaintiffs made their claim against the defendant secondary.    They first reported the losses to the millers and drew on them for the amount.    Nor do I think that the terms of the agreement contemplate any other practice.    And so when the plaintiffs were unsuccessful in their efforts to collect of the millers, they demanded pay of the defendant, which was refused.    I shall hereafter refer to the scope of the obligation of the defendant.

## "THE DEFENSES.

"Having concluded that the Antwerp agreement constitutes a contract of guaranty by the defendant, and having shown the losses resulting to the plaintiffs from the shipments of Scott & Jeffries, the Burrton company and the Hunter company, I will now notice the defenses urged by the counsel for the defendant.

## "LONDON BUSINESS.

"As the plaintiffs were not doing business in London when the arrangement with the defendant was made, the latter contends that the shipments to London are not within his guaranty.    But the essence of the agreement and the purpose of the defendant was to influence business to the plaintiffs for a commission—the shipment of flour to the plaintiffs for sale.

Craig et al. v. Seybt.

The defendant caused the shipments in question to be made to London, and it is not pretended that he did it under any other arrangement than the Antwerp agreement as set forth in the letter of June 25, 1887. Upon these facts it is my opinion that his guaranty covers the London business.

#### "NEGLIGENCE OF THE PLAINTIFFS.

"It is contended that the losses complained of were the result of the negligence of the plaintiffs in making sales, and some evidence is offered tending to show that if the sales had been made at the market rates current, within a few weeks after the respective shipments were received by the plaintiffs, the results would have been in favor of the shippers instead of against them. On the other hand, the plaintiffs justify their action on several grounds, such as advice from the defendant in some cases to hold the flour for an upward market —the short demand at all times for new brands—the general depression in the trade—very little demand, so that sales were impracticable—the last excuse being probably the best.

"Upon the whole, I do not find that the plaintiffs could have made better sales than they did. Undoubtedly, market quotations were higher in the meantime, but I am unable to conclude that sales at the higher quotations could have been made.

#### "THE BURRTON NOTE.

"Another defense is the taking of the note of the Burrton company. I do not think that anything which occurred at St. Louis between Craig and the defendant can be construed as authorizing Craig to take that note. The defendant had at that time, and previously, denied his liability, and what was now said does not show an intention to participate, on his own behalf, in any negotiations which Craig might enter

into with the millers. But the Burrton company was insolvent. In fact, they appear to have been so when their condition was first investigated. The taking of the note did not prejudice the defendant as guarantor. It did not bind him as to the amount of the loss, if any, within his guaranty. Moreover, the note was not taken in payment, and, therefore, did not extinguish the amount, nor affect the right of the plaintiffs to sue on the account at any time. 15 Am. Dec., 82. I confess that I started to investigate this feature of the case with different views, but the foregoing considerations have led me to conclude that the taking of the note of the Burrton company does not absolve the defendant of his guarantee.

### "HUNTER MILLING COMPANY.

"Again it is objected that the plaintiffs have failed to make any case against the defendant for losses on the Liverpool shipment of the Hunter Milling Company, because that concern is responsible and solvent. I think that this objection is well taken. It is the duty of the plaintiffs to enforce collection of these losses from the millers liable for them, if practicable, before resorting to the defendant. In the case of the Hunter company this has not been done, nor is anything shown to excuse the failure to do so.

### "DEFENDANT'S COMMISSION—AMOUNT OF RECOVERY.

"The amount due the defendant as commissions, under the Antwerp agreement, is not very satisfactorily proved. One witness for the plaintiffs testifies that it is 155 pounds, 11 shillings and 11 pence. This would seem to include the transactions to the closing of the amount here in suit, and not including sales resulting in losses. Never has been a subsequent statement furnished by the plaintiffs, down to Septem-

ber, 1896, which increases the amount. The witness, Geis-.
man, has made some calculations, aided by this latter state-
ment, from which he concludes that about 285 pounds are due
the defendant as commissions. But this conclusion seems to
have been reached, to some extent, by estimates of sale value
of the flour rather than actual sales. I think that $1,250
is as much as I ought to find due the defendant as commis-
sions, being about 258 pounds. And, in this connection, it
is proper to say that if the theory of the plaintiff is correct,
if they are entitled to recover anything in this case, their re-
covery should be the amount lost by means of Scott & Jeffries
and the Burrton company, excluding interest charged as afore-
said, less the said $1,250 due to the defendant for commis-
sions, being a net recovery of $2,488.54, to bear interest at
the rate of six per cent per annum from the date of this suit.

## "SCOPE OF THE DEFENDANT'S GUARANTY.

"The defense of the statute of frauds does not seem to
be tenable, and has not been insisted upon here in argument.
There consequently remains to be considered the serious ques-
tion of the scope of the defendant's guaranty. The words of
this guaranty are, 'you stand between us and the miller in
cases of claims for inferiority of quality, or otherwise, in pur-
chases and in cases of overdrafts, etc., on consignments.' There
is no question here about claims for inferiority of quality
or otherwise in purchases. This contest is on account of over-
drafts on consignments.

"In their petition, in this case, the plaintiffs define the
obligation, in this particular, to be an undertaking by the
defendant to compensate them for all loss on account of over-
drafts by decline in the value of flour consigned to them, and
they contend that, by his letters and testimony, the defendant
admits this to be the meaning of his agreement.

"There has been no practical construction of this obliga-

tion, that is to say, the parties have never agreed upon a particular loss as being covered by it; while there is much in the case as presented which shows that the defendant considered himself bound by the agreement it nowhere appears that he has admitted a liability for losses such as are here in controversy, consequently he is not precluded from insisting here that his guaranty is limited to what is expressed by the words above quoted. Now, I do not think that those words constitute a guaranty by the defendant against a decline in the plaintiffs' market. Such an interpretation gives to the plaintiffs the principal benefit of the business and imposes on the defendant all the risk, a consequence which does not strike the mind favorably. Not that the defendant might not have so obligated himself, but to have that effect the promise should be very clear and explicit—so explicit, indeed, that in no other way could effect be given to the promise, which certainly is not this case.

"It will be recollected that the plaintiffs authorized drafts on consignments for two-thirds to three-fourths of the value of the flour f. o. b. and that one of the services rendered by the defendant was the fixing of the amounts of these drafts under that authorization. The term 'overdrafts' in the agreement would thus seem to mean the drawing of drafts exceeding the authorized amounts, and my opinion is that the guaranty of the defendant is limited to drafts of that character. But the evidence is that the drafts drawn in the cases in question were fully authorized. In no instance do they appear to have exceeded two-thirds or three-fourths of the value of the consignment f. o. b. And the plaintiffs made no objection to any of these drafts, but the flour remained in their hands until by decline in the market, and by storage and other expenses, a loss was sustained.

"In my opinion such loss is not within the scope of the defendant's guaranty, and I accordingly recommend judgment for the defendant."

Plaintiff moved the court to set aside the finding of the referee, alleging among other grounds that the referee erroneously construed the contract. This motion was sustained and the court rendered judgment for plaintiff for thirty-one hundred and seventy-seven and three one-hundredths dollars. After an unavailing motion for new trial defendant appealed.

The controversy is in regard to the construction of the second clause of the contract, which reads as follows:

"2. You stand between us and the miller in cases of claims for inferiority of quality, or otherwise, in purchases, and in cases of overdrafts, etc., on consignments."

The referee was of the opinion that under this clause, the defendant was not bound to make good the difference between the amounts of the drafts drawn against the several consignments, and the net amount realized on the sales of the flour by the plaintiffs. The learned circuit judge took the opposite view, set aside the referee's recommendation that judgment be given for defendant, and entered judgment for plaintiffs. Plaintiffs contend that the construction given the contract by the trial judge is in harmony with the construction placed on the contract by the defendant himself. There is much in defendant's letters in support of this contention, and if the language of the contract is vague, or if it is susceptible of different constructions, then the construction which the parties have placed upon it and acted on, is of great weight. Union Depot Co. v. C. R. I. & P. Railway Co., 131 Mo. 291, and cases cited on page 305; Rose v. Carbonating Co., 60 Mo. App. 28.

What the parties understood by overdrafts, against which Seybt agreed to protect the plaintiffs, is made clear by the evidence of the parties and by their correspondence.

James S. Craig, one of the plaintiffs testified as follows: "We made no inquiry as to the solvency of the millers because we relied on Mr. Seybt's guarantee as arranged with

Mr. Begg at Antwerp, Belgium, on the seventh or eighth of June, 1893."

On cross-examination, Seybt testified as follows:

"Q. What do you mean by an overdraft in this business? A: Ordinarily, the term overdraft is when I draw more than what I have coming to me.

"Q. Do you not also in this business mean by overdraft where you have drawn against a shipment of flour, and the price of the flour has subsequently declined, making the amount due the broker more than the market value of the flour? A. It depends upon circumstances.

"Q. Did you not so use it in this correspondence? A. Yes, I am willing to give you a point. I make myself personally responsible morally and financially to protect the parties who get the flour from me. I have been doing it for twenty years, and do it to-day; am doing it with a great many, provided the other parties use the proper exertion to protect me.

"Q. That is, you do not deny you would be liable if. R. Hunter Craig & Company had done what you thought they should have done to dispose of the flour promptly? A. Yes, sir.

"Q. They are claiming here that you drew against them for certain shipments of flour, and that they paid the drafts, and that the flour became of less value in the London market than the amount of drafts they had paid? A. That is their statement.

"Q. Now, I am asking you if that is not what you and they call in your correspondence an overdraft, when they drew back for the difference? A. They called it margin.

"Q. Did you not frequently in your letters speak of it as overdrafts? A. I may have used that expression.

"Q. Did you not frequently use that expression? A. That might be the case for all I know.

· "Q.   And you also designated it as margin and so did they?   A.   Yes."

In Seybt's letter to the plaintiffs we find the following expressions in reference to the matter.   "Be sure to give me timely notice by cablegram, or by prompt letter, if the accounts of any one shipper should show a considerable balance against the shipper, so that I may be enabled to make a proper collection forthwith.".   Again, "Having had the management of these shipments, I exercise the authority for settlement of the accounts and as far as you are concerned I assume all personal liability regarding this balance of 44 pounds, 15 shillings and 11 pence."   Again, "While I am, so to say, personally responsible for the financial transactions between you and the shippers I recommend to you, I do not wish to take any responsibility arising from orders to store or hold flour." And then again, "I can not understand why you should cable me for margins and at the same time draw direct on shippers. As I told you in my former letters, I met all these collections either in cash or by shipments.   Please avoid a repetition of that.   If you cable me I shall always go to work immediately to make these collections, and it will not be necessary for you then to draw direct, so as to avoid confusion and dissatisfaction by the shippers."

These letters all have reference to the shipments by the Kansas millers and are clear evidence that Seybt did not understand that he was relieved of his guarantee by simply protecting the plaintiffs from the drafts exceeding two-thirds or three-fourths of the market value of the flour f. o. b. at the place of shipment.   The learned referee must have lost sight of these letters and of Seybt's evidence when he reached the conclusion that under the contract as to the Kansas shippers, Seybt's guarantee was discharged on the proof that no drafts had been drawn in excess of two-thirds or three-fourths of the value of the shipment at the place of shipment.

Under all the evidence there is but little if any room

for doubt that Seybt's guarantee on overdrafts was understood by both parties that he would make good to plaintiffs all differences between the net proceeds on the sales of the shipments on the European market and the drafts drawn on the shipments of flour by the shippers with Seybt's approval, and which had been honored by the plaintiffs.

Seybt's contention with the plaintiffs, before the suit was commenced, was that he was not liable for the reason, as claimed by him, that plaintiffs had negligently failed to sell the flour when they should have sold it and that the loss accrued through their negligence. He made no claim at that time that he was not liable on the ground that no drafts had been drawn in excess of two-thirds or three-fourths of the value of the flour f. o. b. at the place of shipment.

As we view the contract as construed by the parties themselves, the arrangement to limit drafts to two-thirds or three-fourths of the value of the flour at the place of shipment was for the protection of Seybt. It was not intended or understood to restrict or limit his guarantee against overdrafts. This view leads to an affirmance of the judgment and it is so ordered.

Judges *Goode* and *Barclay* concur.